## HOME RULE AS EMBODIED IN MUNICIPAL CHARTERS.

Common Pleas Court of Cuyahoga County.

EMIL GOEBEL v. THE CLEVELAND RAILWAY COMPANY.

Decided, April 1, 1915.

*Local Government Under the Amended Constitution—Municipal Char-*
*ters—Provisions of, Prevail Over Legislative Acts—Extent of Powers*
*Which May be Granted—Delegation of Sovereignty—Franchises*
*Distinguished from Contracts—Obtaining of Consents from Abutting*
*Property Owners to the Building of a Street Railway—Not Re-*
*quired Under the Cleveland Charter—Evils Abated Thereby—Right*
*to "Consent" Not a Property Right.*

1. A municipality which has adopted a charter under the Home Rule
   Amendment has the same power to legislate, through its council
   and within the provisions of its charter and the state Constitution,
   as has the General Assembly to exercise such power; and the pro-
   visions of its charter in effect operate as a repeal of statutes in
   conflict therewith.
2. The test whether a municipality which has adopted a charter is act-
   ing beyond the scope of its authority must be determined by refer-
   ence to the state Constitution, and not to acts of the Legislature.
3. Under the provisions of the charter adopted by the city of Cleveland
   an agreement may be entered into between the municipality and
   a street railway company whereby the latter may build a street
   railway line, under the conditions imposed by said agreement, along
   a designated street or streets without first obtaining the consent
   of the abutting property owners.

*Hoyt, Dustin, Kelly, McKeehan & Andrews,* for plaintiff.
*Squire, Sanders & Dempsey,* contra.

VICKERY, J.

The plaintiff is an abutting property owner of premises on
Archwood avenue in the city of Cleveland, and brings this ac-
tion to obtain a permanent injunction to restrain the defendant
from laying its tracks in a portion of said street.

Plaintiff alleges that he uses Archwood avenue as a means of ingress and egress to and from his premises, and unless the laying of the tracks is enjoined, the plaintiff will suffer irreparable injury.

It is averred in the petition that the defendant failed to secure permission from the city council of the city of Cleveland to construct said tracks, in accordance with Section 3768 of the General Code of Ohio; and further, that defendant failed to secure the written consent of a majority of the abutting property owners on said street, as required by Section 3770 of the General Code of Ohio.

The answer of the defendant admits the ownership of the premises, as alleged in the petition, and admits that unless it is enjoined it will construct and operate a single-track line of electric railway in Archwood avenue. Defendant admits that there was not filed the written consent of a majority of the abutting property owners along the line of said railway. The answer also sets up as an affirmative defense that the defendant obtained the right to construct the proposed railway from ordinance No. 32925 of the city council of Cleveland, passed May 18, 1914. And in said answer it is alleged and averred that on July 1, 1913, the electors of Cleveland adopted a charter, which provides that the consent of abutting property owners shall not be required for the construction of a public utility, unless such public utility constitutes an additional burden on the rights of the property owners. It is also averred that the proposed line of railway is not an additional burden upon the rights of the property owners.

To this answer the plaintiff has demurred, on the ground that it does not constitute a defense to the action; and this case was heard upon that demurrer, and the questions raised are, whether or not the charter adopted by the voters of the city of Cleveland, with respect to the obtaining of the consents, shall prevail; or whether the sections of the General Code, to-wit, 3768-3777, shall prevail. The arguments in the case have taken a wide scope, for it raises the question as to whether or not the people

of Cleveland obtained any rights under the charter which they did not have under the statute; or whether, so far as local government is concerned, the charter supersedes and in effect abrogates the statutes upon that question. These questions involve a discussion and thorough understanding, not only of what is local self-government, but also a construction of some sections of Article XVIII of the amendments to the Constitution, and of Section 3370 of the General Code.

In approaching these questions, I do so fully understanding the duties of the court, and having a firm conviction that the three co-ordinate branches of our government should be preserved, that is, the legislative, the executive and the judicial; and, speaking more particularly of the legislative and judicial, I have a firm conviction that the court should not interfere with the legislative department of the government, unless the legislation is clearly inhibited by the Constitution. It is no part of court's duty to seek to override the legislative part of the government, simply because he may not agree with the legislation or the trend of legislation. This proposition was well amplified a long time ago by Chancellor Day of the Supreme Court of New York, in a case against the city of New York, where legislation sought to make the city liable for damages done by mob violence. Our own Supreme Court, in the case of *Caldwell* v. *Commissioners of Cuyahoga County,* laid down the same doctrine. I myself argued that case in the Supreme Court. And it has been decided by the courts of every state in the Union that the courts have no business to interfere with legislation simply because the court does not agree with the policy of the legislation, unless it was clearly in contravention of the Constitution or other laws of higher import.

So we will regard it as settled that, no matter how unwise the legislation may be, no matter how much the court may disagree with the legislation, it is not its province to interfere with the legislative department, unless such legislation clearly contravenes the Constitution.

Coming now to the question before us with this in mind—

what was the purpose of the amendment to the Constitution which provided for home rule for cities in the state of Ohio?

Section 1 of Article XVIII provides for the classification of cities, and there is a uniform classification into cities and villages.

Section 2 provides that general laws shall be passed to provide for the incorporation and government of cities and villages; and provides that additional laws may be passed for the government of municipalities adopting the same; but no such additional law shall become operative in any municipalty until it shall by a majority of those voting thereon under regulations to be established by law.

Section 3 is the section particularly under fire in this litigaton. It provides that "municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce, within their limits, such local police, sanitary and other similar regulations as are not in conflict with general laws."

Then two questions arise as to this action: First, is the granting of a franchise by the city of Cleveland to a railway company to lay its tracks on one of the streets a matter of local self-government? Second, if it is a matter of local self-government, whether or not the exercise of that power by the municipality is subject to the general laws of the state of Ohio.

A proper answer to these questions will settle the law as to this case.

It is argued upon the part of the city, which has filed a brief in this case, and also upon the part of the railway company, the defendant, that the restriction contained in Section 3 relates only to the exercise of power by the municipality over the police, sanitary and other regulations. There is also before the court a copy of a brief filed in the Supreme Court of Ohio in case No. 14791, now pending there, *State of Ohio, ex rel George D. Hile,* v. *Newlon D. Baker, Mayor of the City of Cleveland, a municipal corporation, Thomas Coughlin, and W. F. Thompson.* This action was brought by Hile as a tax-payer to knock

out the sinking fund commission provided for in the city char-
ter, holding that the taxation question is a question beyond the
power of municipalities to affect by a charter, that it is clearly
a state function, and taxation should be uniform throughout
the state. And they base their argument upon Section 1 of
Article XIII of the Constitution, which provides that the Gen-
eral Assembly shall pass no special act conferring corporate
powers; and Section 6, which provides that the General As-
sembly shall provide for the organization of cities and incorpo-
rated villages by general laws, and restrict their power of taxa-
tion, assessment, borrowing money, contracting debts and loan-
ing their credit so as to prevent the abuse of said power. I
have quoted the articles that existed prior to the amendment.

The question presented is, how far these provisions of the
Constitution have been changed or modified by Sections 3 and
7 of Article XVIII, one of the late amendments to the Consti-
tution. It will not be necessary for me to decide that question
here, for I think there could be a clear distinction drawn, if it
were necessary, between the taxing power and the power of the
city over its streets with respect to the laying of street car
tracks.

One of the things to which my attention has been directed
is the debate in the constitutional convention over the proper
construction of Section 3, the home rule amendment. Indeed
one of the ultra home-rulers, Mr. Fitzsimmons of this city,
introduced a bill, after the convention had agreed upon the
wording of Section 3 and Section 7, to place a comma after the
words ''local self-government'' in Section 3; and that bill pro-
voked a warm discussion as to what was meant by the term
local self-government, and whether or not the limitation upon
a municipality over the police, sanitary and other regulations
applied to other things relating to municipal affairs. I have a
keen admiration for one of the men who took part in that dis-
cussion, and whose opposition led to the laying of this proposed
amendment indefinitely upon the table, which put the conven-
tion on record as refusing to insert a comma after the words

"local self-government." I refer to Mr. Winn of Defiance, whom I have known for thirty years. Had it not been for this discussion, it seems there could be no doubt that the limitations referred to the things enumerated in the section both by the phrasing of the section, and by the well-known rule of construc- that where one seeks to enumerate certain powers or things coming under a restriction, the restriction applies only to those enumerated. In other words, a construction has been put upon that sort of phraseology, in contracts and other matters, by courts universally, that when one undertakes to enumerate cer- tain things, only those things come under the restriction there enumerated. So I say, both the phraseology of this section and this well-known rule of construction would lead one to conclude that the section should be constructed as though there were a period after the words "self-government"; and that, so far as things affecting local self-government are concerned, the munic- ipality had full power and control over such matters; and be- cause the police power, sanitary and other similar regulations like the police power and sanitary power, or, in other words, the police and health departments, are necessarily under the state laws, for the reason that they are more far-reaching than the boundaries of a municipality, and they affect the entire body politic of the state, and even farther than the state; so that, whatever regulation cities have over the police and sanitary de- partments, they are necessarily subordinate to the general laws of the state, and must not in any way conflict with them. If they do, they are invalid.

Now, when the home rule amendment was adopted by the people of the state in adopting these amendments to the Consti- tution, they must have meant something; and if local self-gov- ernment could only be exercised when it did not conflict with the general laws of the state all the energy of the home-rulers was wasted and the people themselves were deceived. I know it is argued that this gave a municipality the right to act in ab- sence of such action upon the part of the state Legislature; but the Legislature, if it was in session, or at the next session, could

nullify by a general law any provision of a charter; and if the Legislature felt opposed to a certain city and its charter provisions, every one of them might be nullified by a general law upon that subject which was different from the one provided for by the charter. And so I say that the action of the convention upon this question was futile, and the people deceived when they voted for and expected to get home rule in municipal affairs, if municipalities can only exercise the powers granted by charter subject to the approval of the Legislature, or can only exercise such powers when not in conflict with existing laws of the state.

The question of government of our cities in the state of Ohio is older than most of us that are practicing law today, and the manner of evasion of the general law had become a scandal in Ohio; and it was proper and usual for every state Legislature to rip up the governments of the cities because those in power in a particular city were out of harmony or not in good standing with the dominant party in the state Legislature. The people of Ohio had become tired of having their local self-government upset by the great mass of legislators over the state, who neither understood their conditions and institutions nor knew the problems that they had to work out; and so when the convention met in 1912 they sought to provide by general law for the incorporation of cities and villages and to have them classified as such; and then they sought further to take the conduct of municipal affairs out of the power of the Legislature and to put it in the hands of themselves who knew the needs of the community best, to-wit, the people of the city, and thus sought to provide for local self-government that would be beyond the reach of each successive Legislature; and therefore they fixed the power in the Constitution itself; and so the only question whether or not a municipality that has adopted a charter is acting beyond the scope of its authority must be measured by the Constitution itself. So if an act provided for by the charter does not exceed the powers of the municipality which are given it by the Constitution itself, such power must be upheld. If this is not

true, then the people of Ohio might be said to have been buncoed into voting for something that was different from what they anticipated.

Now, it is argued that this is a delegation of sovereignty: that the state has no right or power to delegate its sovereignty; that there can not be a sovereignty within a sovereignty. Of course that statement begs the question, for it is not true that a sovereignty can not be created in a sovereignty. The United States is sovereign; every one of the states is sovereign; but a different kind of sovereignty. The state of Ohio is no less a sovereign because a paramount sovereign, the United States, has jurisdiction and powers within the borders of Ohio. Indeed, our form of government has been the admiration of statesmen and students of government in all lands, because of the smooth way in which divided sovereignty might exist side by side without breaking down the sovereignty of either. So I say that it is not true that sovereignty can not be delegated; and it does not lessen the sovereignty of the state of Ohio because it has seen fit to delegate certain rights of sovereignty to a city which has adopted a charter, the city of Cleveland if you please. It does not lessen the sovereignty of Ohio for the reason that all sovereignty lies in the people, and the people can, by amendment to their Constitution in a way provided for by the Constitution itself, reclaim that sovereignty any time they see fit; but so long as that has not been reclaimed, the city would have the right to exercise the sovereignty granted it by the Constitution, and the legislative acts would be absolutely futile, because the Legislature is a creature of the Constitution; and the city, under a charter adopted in accordance with its provisions, is likewise a creature of the Constitution; and the city, acting under its charter, has the same rights and powers within the sovereignty granted that the Legislature has. Somebody has said that the power of amendment in a Constitution is the power to change the form of government without a revolution; and no one who is familiar at all with our idea of government can for a moment dispute the proposition that the people of the United States, by follow-

ing the course marked out in the Constitution, to-wit, by amendment, could change a republic to an absolute or limited monarchy if we saw fit, and that could be done peacefully without a revolution. So could the people of Ohio do the same thing, if it were not for the limitations placed upon the state by the Constitution of the United States, which provides that the state government must always be a republic in form. If it were not for that provision in the Constitution of the United States, the people of Ohio could, by the power of amendment, absolutely change their form of government into that of a limited or absolute monarchy. So it is futile for one to say that a state can not grant sovereignty to a political subdivision within its borders. It is futile to say that the state of Ohio has lost its sovereignty because it has granted sovereignty to a political subdivision of the state, because at any time the sovereign power, the people, can withdraw from that political subdivision that sovereignty and take it unto itself. But the sovereign power is the only one that can do that, and that is the people of the state, and the Legislature is only a servant of the people, the true sovereign.

So now it must follow that a state may grant sovereignty to a city under our present Constitution. And when a city has, in accordance with the provisions of that Constitution, to-wit, Section 7, adopted a charter a new law-making power is created within the state, and the city council of the city of Cleveland has the same power to legislate, within the provisions of the charter and the Constitution of the state, as the Legislature itself has to exercise its powers. Such legislation of the city council must necessarily supersede that of the state Legislature; otherwise the whole home rule proposition is of no force or effect whatsoever.

So now the question comes as to whether the granting of a street railway franchise by the city is a matter of local concern. If it were not for the high standing of counsel for the plaintiff at this bar, and his reputation for learning as a lawyer, one would think that he had become confused between the different

kinds of franchises, for much stress was put upon the question as to the power of a city to grant a franchise, and my attention has been called to perhaps a score of cases where the definitions have been referred to. This is one: 27 N. Y. Reports. The definition of a franchise by Bouvier is, "A privilege conferred by grant from the government and bestowed on individuals." I call attention to this one because it is a sample of many to which I have been referred, and then an argument based upon that, that the right to grant a franchise was a state function, and that a municipality could not, under any circumstances, grant a franchise.

Now, the franchise that Bouvier was defining, and the franchise that the cases cited referred to, are purely subjects of state grant or creation. In other words, the word franchise is used in a dual capacity. First, we mean a right for a corporation to exist. Now, that must come from the state, because in many instances it carries with it the right of a limited eminent domain. It is a grant of a part of the state sovereignty, if you please, in a limited extent. And one readily concedes that the city of Cleveland, even under its charter, could not create a corporation. It has not been granted such power by the Constitution. The creation of a corporation is a state matter; and a franchise, used in that sense, can only come from the state; and I quite agree with counsel that such a franchise could not be granted by the city of Cleveland, either before or after the adoption of the home rule amendment. But now, the other sense in which use the word franchise—we use it in the sense of a contract. It will not be contended for a moment that the Cleveland Railway Company has not the power to make a contract. It is a corporation. It is given the right to make contracts. It would be called a contract if it was made between the Cleveland Railway Company and a citizen or an individual. Now, because the city of Cleveland is a sovereign within the limited field marked out by the Constitution, hasn't it the power to make a contract? If it makes a contract with the street railway company, by ordinance which would be accepted by the railway

company, to lay railway tracks upon a particular street, that would be called a franchise. Now, there is just as much difference between that sort of a franchise and the franchise to which I have already alluded, and which has been argued before me at great length, as there is between night and day. There is no similarity between them whatever—nothing similar except the names. So all the argument with respect to franchises in that respect comes to naught. And in Section 4 of the Constitution it is provided:

"Any municipality may acquire, construct, own, lease and operate, within or without its corporate limits, any public utility and product the service of which is or is to be subject to the municipality or its inhabitants and may contract with others for any such product or service." *  *  *

Now, the Constitution itself gives the municipality the power to contract; and when a contract is entered into between the city of Cleveland and the street railway company, it is nothing but a contract, though we may call it a franchise. Indeed no other power could make a contract to lay upon the streets of Cleveland a railway track except the city of Cleveland itself. So it seems perfectly clear that Cleveland was granted the power of local self-government.

Now, are the streets a matter of local self-government? The General Code of Ohio makes the city the custodian of the streets, makes the city liable in damages for any injury that results to any person by reason of the fact that the streets are not kept free and open and clear from nuisance. There was no common law liability upon the city, but it is a creature of statute. Yet the city of Cleveland has control over its streets with the right of every person to use those streets to travel upon. Now, has it the right over the streets to such an extent that it can, by a provision of the charter, build a street railway upon the streets without the consent of the abutting property owners?

Section 187 of the charter reads as follows:

"No consent of the owner of property abutting on any highway or public ground shall be required for the construction,

extension, maintenance, or operation of any public utility by original grant or renewal, unless such public utility is of such a character that its construction or operation is an additional burden upon the rights of the property owners in such highways or public grounds.''

Section 3770 of the General Code provides:

''No such grant shall be made, except to the corporation, individual or individuals, that agree to carry passengers upon such proposed railroad at the lowest rates of fare, and shall have previously obtained the written consent of a majority of the property holders upon each street or part thereof, on the line of the proposed street railroad, represented by the feet front of the property abutting on the several streets along which such road is proposed to be constructed.'' * * *

The evident purpose of Section 187 of the charter was to abrogate so much of Section 3770 of the General Code as relates to the written consent of property owners. Now, the power of the city and its charter to take away the right of the property owners provided for in the section of the General Code to which I have referred, depends upon the question as to whether or not the owner has a property right in the consents or whether it invades his property right. It was admitted frankly by counsel in argument that the Legislature would have undoubted right to repeal, or modify, or change this provision at its will. That admission concedes that there has been no property right granted to the abutting owner. It is only a privilege that could be taken from him. If we go back a few years and recall to our minds what was almost a scandal in the clamor for consents, and the purchasing of consents, and parties selling consents to one railroad company and then selling them at a higher rate to another railroad company, we can see one reason why the charter provision was adopted by the people of this city. Why, it was no uncommon thing for men to go upon the streets with large bankrolls and buy consents from individuals. Now, this was not a property right; it was only a privilege that was conferred upon the owners of the abutting property on the streets

of the proposed railroad route. It may have been a wise provision. It may be now a wise provision as a general law of the state because companies might seek to put railroad tracks upon a street where they should not, and where there is no demand for it to be, but in this case the railroad company is not seeking for any grant. It is the city that is seeking to compel them under the powers granted the city in the Taylor franchise or grant to compel the railway company to put tracks in a particular street or streets. And so it has been universally held that this right to consent was not a property right, and therefore a vested right of individuals has not been invaded, and therefore if the building of a street railroad be of local concern, why hasn't the city of Cleveland the right to provide in its charter that consents should not be necessary before a street railroad could be laid. I can conceive of nothing more local in its character than a street railroad system which gets its power from the city, which occupies the streets of the city, particularly in Cleveland where the whole management and control of the street railroad is ultimately in the city council by the Taylor grant itself, and a commissioner who is appointed by the mayor with the consent of the council. The provision of the charter provides that consents shall not be necessary unless it impose an added burden upon the property.

In the case of *Traction Co.* v. *Parish*, 67 O. S., 181, Judge Burket of our Supreme Court, at page 191, says:

"While the abutting lot owner has this right of public travel on the street, and the right of ingress and egress from the street to his lots, the public authorities retain the right to improve the street, and place such means of travel thereon as in their judgment shall best conserve the public welfare. And so long as his easement of ingress and egress is not materially injured, he is without remedy, because he is not wronged, said easement— all the property right he has in the street—not being interfered with."

And again in the case of *Street Railway* v. *Cumminsville*, 14 O. S., 523, Ranney, J., at pages 545-6 says:

"The use of such a highway for the purposes of a street railroad involves the application of new appliances and modes of travel, rather than of any new principle.  *  *  *  So far as carrying of passengers by this mode is concerned, it differs in nothing from the exercise of the common right of carrying them by coaches or omnibuses.  *  *  *  When this grant is confined to a mere occupation of the easement, previously acquired by the public, although its enjoyment may require a restriction upon former modes, we can see nothing in it but the control, regulation and adjustment of a public right, so as to make it best answer the purposes, and meet the wants of all classes of the community."

So it would seem from these authorities that the street railroad, however obnoxious it might be to some people, and the running of cars over said railroad, is not an added burden for which the abutting property would be entitled to compensation, nor is it necessary to appropriate.  In other words, it is simply an added use for which the highway is laid out, kept up and maintained, to-wit, for the use of the traveling public.  So, there is nothing added by way of burden, and as it is a local matter it seems to me that the Constitution of the state of Ohio as amended in 1912 gives the city the right, and it has adopted a charter to manage and control its own local affairs without let or hindrance from the Legislature, and the charter provision in effect operates as a repeal of the provision of the statute so far as it relates to the grant of consents in the city of Cleveland, which has adopted a charter.

Now, it is argued that this is a violation of the principle of the uniformity of the laws throughout the state relating to municipal corporations.  Fortunately we are not left to guess as to what the rights are in this respect.

In the case of *State, ex rel City of Toledo,* v. *Lynch,* 88 O. S., 71, a decision is rendered by Judge Shauck, one of our ablest judges, and who is not at all in accord or in sympathy with the modern idea of local self-government.  Speaking of the application of the uniform doctrine throughout the state, he points out in that case, and indeed the syllabus is as follows:

"The provisions of the Eighteenth Article of the Constitution as amended in September, 1912, continue in force the general laws for the government of cities and villages until the 15th day of November following, and thereafter until changed in one of the three modes following: (1) By the enactment of general laws for their amendment; (2) by additional laws to be ratified by the electors of the municipality to be affected thereby; (3) by the adoption of a charter by the electors of a municipality in the mode pointed out in the article."

Now, you will notice that the Supreme Court pointed out that the uniformity of laws might be interfered with by the adoption of a charter by the electors of the municipality, if carried out as provided for in the Constitution. This case of *Toledo* v. *Lynch* was the first case that went to the Supreme Court, having to define the power of local self-government in the cities. Toledo attempted to establish a municipal moving picture theater, an enterprise not authorized by state laws. The Supreme Court decided that the adoption of a charter was a necessary prerequisite to the exercise of a power not theretofore granted by the Legislature; that is, cities have acceded by that home rule amendment to all the powers of local self-government that had been granted prior to that time, but if they wanted to add new powers, they must adopt a charter for that purpose. Whether or not Toledo, by adopting the charter, would have the right to go into the moving picture business is a matter aside from the present discussion, and indeed was not decided, and could not be decided while that case was before the Supreme Court, but they decided that they could not do it until, at least, a charter had been adopted by the city of Toledo; but the point I want to make is that it pointed out a way in which the uniformity of state government could be interfered with, to-wit, by the adoption of a charter, which provided other and different powers; and so now, within the limits of local self-government provided for by the charter itself, authorized by the Constitution itself, the city of Cleveland has just as much power and right to legislate as the Legislature has for the rest of the state, and the state Legislature can only interfere on such

matters as are of state-wide concern like the health and police power of the state.

We are not left to conjecture on this proposition either. In the Fitzgerald case that went up from this city, was tested the powers of the people to adopt a charter providing for preferential voting. Now, if anything can be of state-wide importance it is the privilege of voting and the election machinery. One would think that that must necessarily be of uniformity throughout the state. The Constitution itself even provides the method of voting, in a measure, and yet the Supreme Court of this state held that the charter provision as to preferential voting was not in conflict with the Constitution, and upheld the charter in that respect. Judge Donahue dissents from that decision, but not on the ground of its contravening any act of the Legislature, but he contends that it contravened another amendment to the Constitution which was adopted at the same time, adhering to the doctrine laid down in that case, that so far as the legislative acts are concerned, the charter in that respect prevailed.

Now, that is going farther than is necessary to go in this case.

Again, the Supreme Court rendered a decision in the case of *State, ex rel Lentz et al, Civil Service Commission,* v. *Edwards et al,* which will be reported in 90 O. S. The case went up from the city of Dayton and is known as the Dayton case. The city of Dayton adopted a charter and provided for a manager as the head of its government, and the charter provided for the appointment of a civil service commissioner, which was different from that provided for by the Legislature. In that case, Chief Justice Nichols, rendering the opinion, cites *Toledo* v. *Lynch,* 88 O. S., 71, and *Fitzgerald* v. *City of Cleveland,* 88 O. S., 338, the first to show how the constitutional provision for the uniform government of cities and villages could be changed, to which I have already called your attention, and the second to show that the charter, when adopted by a city, had the right to define the powers and duties of the different departments, pro-

vided they did not exceed the powers granted in that article nor disregard the limitations *of other provisions of the Constitution.* You will notice that it excludes from this all acts of the Legislature, but only includes the charter and laws made in conformity therewith, and made in conformity with the articles of the amendment of the Constitution providing for home rule and limitations imposed by other provisions of the Constitution. The Supreme Court goes on in this Dayton case to say:

"The manner of regulating a civil service of a city is peculiarly a matter of municipal concern. One of the powers of local self-government is the power of legislating with reference to the local government within the limitations of the constitutional provisions above referred to. As long as the provisions made in the charter of any municipality with reference to its civil service comply with the requirement of Section 10, Article XV, and do not conflict with any other provision of the Constitution, they are valid, and under the cases referred to, discontinue the general law on the subject as to that municipality. That provisions adopted by a city might differ from the general laws within the limits defined, was not only expected but the very purpose of the amendment was to permit such differences and make them effective."

Now, the court in this case absolutely decided the question at bar because surely the civil service is of as state-wide importance as the building of a street railroad within the streets of a municipality, and surely if the state law upon the civil service was abrogated by the adoption of the Dayton charter, so long as it did not conflict with other provisions of the Constitution, the state law relating to the consents of property owners or abutting owners on the streets where a railroad is to be built must be abrogated by Section 187 of the charter, and there can be no question from these authorities that the state law relating to the giving of consent of abutting property owners is in effect repealed, so far as the city of Cleveland is concerned, and it was perfectly within the power of the people of Cleveland in the adoption of their charter to so abrogate the statute, and why shouldn't it be so? Who else is interested in the

building up of the means of travel in the city except the people of the city themselves? Is it possible, under the home rule amendment, that the Legislature could be antagonistic and could interfere with the domestic concerns of a city, and repeal the provisions of our charter, by passing state laws upon the subject that the people have already legislated upon by their charter? If it were so, then the home rule amendment would mean nothing whatever.

My attention has been called to the construction that is placed upon similar charters in states where home rule has been allowed. In almost every instance those cases have gone at great length, some going so far that one could hardly go with them. I will not stop to cite the authorities, but they seem to be numerous and all under the same line. Of course, it is argued that the same words that were in the California home rule amendment, for example, were not adopted in the amendment to our Constitution. The debates of the constitutional convention showed bitter antagonism upon these various questions that were discussed, and the opponents of home rule apparently thought that they had succeeded in pulling the teeth out of the home rule proposition. The *ultra*-advocates of home rule wanted to have inserted in the home rule proposition as an *addenda* or an addition to Section 3 as it now stands the following:

"But such regulation shall be subject to the general laws of state except in municipal affairs."

This was in effect the California amendment, but a compromise was agreed upon in adopting Section 3:

"Municipalities have authority to exercise all powers of local self-government, and to adopt and enforce, within their limits, such local police, sanitary and other regulations as are not in conflict with general laws."

And Section 7:

"Any municipality may form, or adopt, or amend the charter of its government, and may, subject to the provisions of Sec-

tion 3 of this article, exercise under it all the powers of local self-government.''

Now, it was argued by the opponents, and thought by the opponents of local self-government that if the qualifying phrase of Section 3, ''as are not in conflict with general laws,'' applied to all activities of the municipalities, then Section 7 would also be a limitation upon such charters as municipalities might provide, so that all local legislation would be subject to the general laws of the state, or, if true, of course, would have been defeating the very end of home rule as I have already pointed out.

I think, and I can't help but think, that the first phrase ending with ''local self-government'' granted complete and absolute power to the people of the municipality to provide by charter for all matters purely of local self-government, and then the rest of the phrase simply gave them added powers over local police, sanitary and other similar regulations, and then, recognizing that those enumerated powers were a matter of state-wide control, they put the modifying or limiting phrase on, ''as are not in conflict with general laws,'' and, of course, if that were so, the adoption of Section 7, subject to the provisions of Section 3 of implied limitation thus contained in Section 7, would be limited to the limitation contained in Section 3, and this seems to have been the construction placed upon it by our Supreme Court in the cases decided by them on this charter, and so I am constrained to come to the conclusion that the provisions of the charter, with respect to the granting of consents, prevail, and not those of the state, and therefore the demurrer will be overruled, and judgment entered accordingly.